Good morning, your honors. Good morning. Michael Kennedy here on behalf of Mr. Acosta-Tapia. Mr. Loren Graham and I will split our argument five minutes apiece and I would reserve one. The main issue here is whether this consent in this highway traffic stop was unequivocal, specific, freely, intelligently given. The thrust of the argument is that the District Court judge misapprehended that heavy burden because of three factors. First, there was no expressed object to the search and thus no defined scope of the search. Second, the consent that was given was given by an individual that did not speak English, nor could he read Spanish. The undisputed testimony was that his reading skills in Spanish was less than a first grader's skills in this country. He was someone who had only three years of rural schooling in Mexico. The District Court seemed to rely primarily then on the oral conversations. Isn't that correct? Yes. In fact, he... In terms of establishing the fact of consent. Exclusively. Yes. So to what extent then does it make a difference whether he could read Spanish or not? First, since he couldn't read Spanish, that takes the form out of the question. Well, it does insofar as his consent. I suppose it's still relevant to the officer's understanding. It does. The testimony was that if someone had spoke to him in Spanish, perhaps he could have given consent. However... Well, there was a primitive level of communication, was there not? Well, to call it primitive would be a stretch. The testimony was that the officer, Trooper Saenz, could not ask in Spanish, could not give this statement, you're free to go. He did not know how to say that in Spanish. He couldn't use the word you, he couldn't use the word can, and he couldn't use the word go in Spanish. The testimony was that he only knew a couple of words of Spanish, fewer than 10 words, that he can order a beer, but he can't order dinner in Spanish, and that the questions were in a combination of English and Spanish, that when he asked questions in Spanish, he was not certain at all what he asked. He didn't know if he was accurate. So is the thrust of your argument, then, that he understood that he was being asked to allow the officers to search, but he didn't know because the officer couldn't affirmatively tell him that he didn't have to consent, that he was free to go? The thrust of the argument was that he would not even have known what the officer was asking, because the specific question was incorrect in Spanish. It was nonsensical. Part of it was the officer used the word lea, lea English, lea Spanish. Lea is not a Spanish word. A person hearing that would not know what he was asking. Well, is there evidence? I mean, I thought the district court found in the combination of circumstances and having struggled with, in a foreign country, not being a foreign language speaker myself, I think we all have, we sort of communicate by, you know, a mixture of whatever we can with hand gestures and everything. And ultimately, in most cases, one can communicate some primitive things. Certainly, the court seemed to think that he understood enough to produce an ID, did he not? And that he went ahead with the search. That's what I'm trying to understand. If you're trying to decide this, have us decide this case that because he couldn't speak exact, precise words of Spanish, that no matter how he communicated, it's ineffective? Or does it come down to something more refined, which is whether or not there was an understanding of the elements of voluntariness? There was not an understanding of the elements of voluntariness, because the level of communication did not rise to the level to make a finding that it was specific and unequivocal, knowing and voluntary. Certainly, there was some amount of communication at hand. But when the object of the search was not set, what was to be searched for was not set. What was going to be searched was not defined. And so there was neither a scope nor a specificity that this heavy burden requires when the individual asking the question knows fewer than 10 words in Spanish. Thank you. We have one from the government. May it please the Court. My name is Craig Denny on behalf of the United States. Your Honor, the government would concur that the communication between the officers and the owner of the vehicle, Mr. Ortiz, was, in fact, primitive communication. However, based on the fatality of the circumstances, the district court found that the defendant's responses to the officer's question, which were in a combination of English and in Spanish, they seemed to establish that they were being able to converse. For instance, when the trooper asked the passenger vehicle owner for the registration and for the identification in the vehicle, the passenger complied. He provided a torn Montana ID card. He searched for the registration and it appeared in the glove box and then actually found it in the console. What would the Spanish word for registration be? Your Honor, I don't believe that was in the record that the officer testified to, whether he asked that in Spanish or in English. The officer did ask a very straightforward question in broken Spanish, which was, may permitte registrar su carro? And the expert for the defense testified that carro would be a Spanish word for car, registrar would be a Spanish word for search, and in a Spanish-English dictionary, permitte means to permit or allow. And I think the district court, Judge McKibbin, was persuaded by the fact that that question is quite simple. Moreover, the object of the search was defined by the questions that immediately preceded that question. The officer asked a series of questions of whether there were firearms, whether there were large amounts of money, and then asked him specifically different types of drugs. Immediately after asking those questions, to which, again, the defendant seemed to respond appropriately by saying no to each of them, the officer asked that simple question in Spanish, can I search the car or may I search the car? And the defendant said, yes, it's okay. So I think it's implicit that the officer ---- They didn't quite say, yes, it's okay. I mean, sort of. Did he say that in English? Your Honor, Judge McKibbin noted that he said, see. And I think when the officer testified, he did ---- Mr. Ortiz actually did respond to some of the questions. But he didn't say, yes, it's okay. I mean, that conveys an element of understanding that I didn't see in the record. He did say, see, didn't he? Your Honor, I believe that in the record, both the officers testified that that was ---- he actually said it was okay in English. Okay. So he did say, use that word. Yes, sir. And on the excerpt of the record on page 28, I believe there was testimony by trooper signs to that effect. All right. I think okay is kind of in the international vocabulary. Yes, Your Honor, I would agree. That is. But I ---- Well, it would be helpful to me, at least, if you would kind of start from the beginning with the stop and why the officer's conduct was appropriate from there through what he ultimately found. Yes, Your Honor. The officer found two traffic violations had taken place. First, that the vehicle that was in front of him made an abrupt lane chain that constitutes for an unsafe lane change. His braking or his lane change? The lane change, Your Honor, that he abruptly came in front of the officer. In addition to that, he also observed the driver of the vehicle, his wheels go over the fog line, which he believed to be a failure to maintain lane. So the officer made his traffic stop in this case for probable cause of these two traffic violations. During the stop itself ---- Very minor violations that I was thinking of normal driving on, for example, on the freeway here and so forth. The lane changes are very frequent, and you can argue quite a bit about whether they're appropriate or not. And then just drifting over the side of the ---- Yes, Your Honor. Your Honor, I think in the context, it was approximately 3.40 in the morning, and the officer's training experience that frequently drivers that are impaired or fatigued at that early morning hour gave the officer some concern that, you know, he sees these two traffic violations and gives him a basis to stop. What's fatigue got to do with it? Well, Your Honor, the driver might be fatigued, might be falling asleep at the wheel, might be drifting out of his lane. It's something possible at this early in the morning that the officers frequently might stop a driver who they think might be ---- had been traveling too long or might be impaired by drinking too much alcohol. Did the defendants challenge the legitimacy of the stop? I don't believe so, Your Honor. There was nothing ---- that issue wasn't raised. It seemed to be the only issue raised in the appeal was more on the consent and the scope of the consent. Okay. Then go forward with that. We have a traffic violation, then what? Well, Your Honor, after the violation occurred, the officer spoke to the driver of the vehicle who didn't have a driver's license or identification. Was he authorized at that time to do any sort of research? Not at the very outset, Your Honor. But as he spoke with the driver and the passenger, there were a number of factors that gave him reasonable suspicion that there might be some type of criminal activity afoot. He smelled a very strong odor of air freshener. He also smelled ---- he also noticed that there were cut lemons lying outside the interior of the vehicle. And then when he asked the driver about ---- What's the significance of the lemons? Your Honor, the officer testified that it's been his experience that sometimes those type of items might be a masking order to cover the smell of controlled substances. He noticed when he spoke to the driver of the vehicle, there were some discrepancies in his story from what the passenger, Mr. Ortiz, said. And Judge McKibbin found those to be substantial discrepancies. One is that the driver said he'd been visiting his sister in Modesto for two days. The passenger, on the other hand, stated he'd been visiting his uncle in Bakersfield for five days. The driver said he had known the passenger for one to two years, but he didn't know his last name. The passenger said, I've only known the driver for three months. When they asked him how they know each other, the driver says, well, we worked on a potato farm together in Idaho. The passenger says, I work on a ranch in Montana. I really don't know what the driver does. Then when he was looking for the registration, the officer also observed Mr. Ortiz, the passenger owner, sort of curiously peer inside the glove box, not really open it up, but sort of gingerly look inside just an inch and close it. And the officer found that was kind of odd, why he just didn't open it up. And later when he actually obtained consent, that was the first place the officer went to search for the narcotics, and they were actually hidden behind the glove box. So there was a combination of factors that the officer relied on, thinking that there might be some criminal activity afoot. And I believe that Judge McKibben found those to be significant for the reason for this detention. Now, how is it that he consented to let the glove box be taken apart? Well, Your Honor, the officer, the government's position is that the officer had asked him a series of questions about whether there were drugs, guns, or money in the vehicle, and those are the items that he'd be looking for to search. So that if I say, you can search my car, I don't say anything more, and I haven't been told you're going to take apart my car to go into false panels and whatever, then that's the scope of the search? Well, Your Honor, the actual written consent form that's in English and Spanish actually specifically, as part of the record, talks about the officers of the getting the getting consent to search hidden compartments of the vehicle. So we have to assume that the officers thought Ortiz knew how to read Spanish when he relied on that? Your Honor, I believe that the Court can find by inference that Mr. Ortiz, his position is he said at the suppression hearing or his testimony was that he didn't read Spanish. However, the officer, when he gave him the consent form, testified that Mr. Ortiz went through the form line by line. Was the form that he went through a phonetic translation into Spanish or was it a written form, written language? Your Honor, first it was the oral consent was the defendant's response to the Spanish may permite registrar su carro or may I search the car. After he said see or yes, it's okay to that, then the officer presented him with the written form, which is written in English and Spanish that lays out who's going to be searching the vehicle, the type of vehicle, and that they will have access or be able to search hidden compartments in the vehicle. But phonetic forms were available and were not used. Is that correct? I'm sorry, Your Honor? Forms with phonetic translations were available but were not used in this case. Is that correct? Well, Your Honor, the form actually had the, it was written in English and in Spanish. So I don't, I don't, the officer didn't read the Spanish version aloud to him. But the defendant indicated to the officer that he read Spanish and then he proceeded to look at the form line by line and then he signed it. The district court seemed to rely not only on the form but seemed to place some emphasis on the fact that while the search was going on and the glove box was being taken apart that the defendants didn't object to it. That's true, Your Honor. How could they object? They were 75 feet away. They couldn't even see what was going on. Well, Your Honor, I would, I would somewhat dispute that the officers were taking apart the car. They were simply, they simply pulled out the area. Well, but that's not responsive. The judge relied on their absence of objection. But if you can't see what's going on, how can you object? They were taken 75 feet away from the car, weren't they? Well, it's standard procedure for the officers not to have an objection. Well, that may be. But if you can't see, how can you object? I don't have a simple answer for that, Your Honor. Okay. Judge McKibben seemed to indicate that the officers asked a series of questions as they're looking for drugs. Yes, but the failure to object implies or assumes explicitly, really, that you can see what there is to object to, unless you object to being put out of position not to be able to see. Well, Your Honor, it would go back to the fact that the officer gives him a consent form telling him that they're going to be accessing the car. It's not responsive. Okay. And I think you've made your point that you don't have a good answer to it. I do have one question. It's not clear to me what the situation with regard to the glove compartment was. I'm trying to picture what kind of a glove compartment. Sometimes they're in the front. Sometimes they're at the side. What had to be done to take it apart? Your Honor, my understanding from the testimony of the officer and the record is that the glove box, when it would open, it would slide out. And the officer didn't need to use any tools. He simply opened it up and pulled the item out. And inside, above the glove box on the passenger side of the vehicle, there was a towel with the drugs inside of it. So it would slide out. Yes, Your Honor. Okay, thanks. Okay, thank you. Thank you, Your Honor. Good morning, Warren Graham. You're double teaming the government. Here, well, we have to do what we can. On behalf of Mr. Ortiz, Judge Gibson asked about whether or not there was another form that could be read to Mr. Ortiz. And I think the process that they had in place at the time in the Reno area was that they did have interpreters that they could call, and there's some testimony about that, if they had Spanish speakers that didn't understand and they needed someone to help explain forms. In this case, that wasn't done. I think important is the context of this stop was that officers testified they were part of an interdiction program. That's why they were sitting out on the freeway at 3 o'clock in the morning. They observed two males drive by. It was a cold morning, and before this consent was presented to Mr. Ortiz, 41 minutes had gone by with him standing in the Albertson parking lot. And I don't think at any point in time were they really free to go anywhere. The officers testified that within minutes of the stop, they considered this to be a drug case. And they made a phone call to bring in the canine to assist in the search. And for the 41 minutes that they were sitting there waiting for the canine to get there, I think they were basically doing what they could do to keep these gentlemen there without them leaving. And then, ultimately, they testified, since they didn't have enough evidence to, or enough probable cause to search the vehicle, that they felt they needed to get a signature on a consent form in order to go ahead with the search. And that was, that's what they were really doing there on the side of the road, was attempting to get a signature so that they could go in the car. The reasonableness of the search itself, I think, has to focus on the disassembling of the glove box that was- Well, that's one thing, the question I was asked earlier, is it really a disassembling, or does it pull out, or what is it? It was a glove box in front of the passenger compartment that had a door on it. And then after you open the door, then the, it's kind of a cardboard, whatever they make the body of the glove box out of, had to be removed. And the actual drugs were found wrapped up in towels stuck up in the back. And so the officer testified- When you say it had to be removed, that's what I'm trying to get to. Is that a big deal, were there screws you had to unscrew, or did you just pull it out? I don't know if there are clips, I mean, it doesn't just come out. I mean, it's not built to just come out. It has to be removed in order to access under, if you're doing work under the dash. Did they have to use any tools? I don't know if they used any tools, or if they just did some clips and took it out. I'm not sure of that, but as far as Mr. Ortiz is concerned, I think we're talking about a primitive level of communication, which the level of communication we had here, we know that the officer, the trooper, spoke a couple of words of Spanish. It was his testimony, ten words or less, and that he evaluated Mr. Ortiz's English as worse than his Spanish. And so- You mentioned that the Reno police had interpreters accessible. Was there any evidence as to why they did or didn't attempt to get them? In this particular case, I'm not sure. No, my understanding is that they were working with the INS and with the federal, with DEA, and between those agencies, that they did have interpreters available. In fact, as soon as they got these gentlemen to the highway patrol station, there were interpreters there. There, but not at the consent. If they had had to give, or did they give Miranda warnings? And if so, whether they did or not, are the officers furnished with some kind of a form that uses Spanish and phonetic, as Judge Gibson was saying, so that there's an oral, ability to orally communicate, instead of trying to make it up at the same time? There was no attempt in this case to give any Miranda warnings. I understand that, but do you know, is there anything on the record about whether they have such a form that the officers can read at? I know Trooper Sines did say that he never attempted to, or he never told Mr. Ortiz that he had the right to refuse. That was never part of what he told him. And there is no way, there is no attempt to further explain the consent, other than what's in the record. So I think our view is that there's no way that there was sufficient communication in order to have the government carry its burden of knowing, intelligent, unequivocal ways. What if the consent was invalid? Was there enough from the strange responses that were being given back and forth to establish probable causes? I don't believe so, and I think there's an admission during the hearing by the officers that they knew they didn't have probable cause, and they had to get that signature on the consent form. Okay, your time is up. Thank you very much. The case is argued, will be submitted. We thank counsel for their argument.
judges: Hug, Gibson, Fisher